# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

DESHAWN A. BUTCHER and MATEO )
BUTCHER, )          C.A. No. _____
)
       Plaintiffs, )          JURY TRIAL DEMANDED
)
  v. )
)
OFFFICER SHAYNE LINKHORST, )
INDIVIDUALLY, OFFICER AVERY )
STEWART, INDIVIDUALLY, )
OFFICER MICHAEL CHAMBERS, )
INDIVIDUALLY, SERGEANT DENNIS )
M. LEAHY, INDIVIDUALLY, )
SERGEANT FREDERICK G. CHAITT, )
INDIVIDUALLY, DAVID KARAS, PH.D, )
INDIVIDUALLY  ROBERT TRACY, )
INDIVIDUALLY AND IN HIS OFFICIAL )
CAPACITY AND AS CHIEF OF POLICE )
FOR THE CITY OF WILMINGTON )
POLICE DEPARTMENT, THE CITY OF )
WILMINGTON POLICE DEPARTMENT, )
THE CITY OF WILMINGTON, and )
JOHN DOE OFFICERS OF THE )
WILMINGTON POLICE DEPARTMENT, )

       Defendants.

## COMPLAINT

### The Parties

1.     Plaintiff, Deshawn A. Butcher ("Mrs. Butcher") is a Delaware resident.

2.     Plaintiff, Mateo Butcher ("Mr. Butcher") is a Delaware resident.

1

3. Defendant, Officer Shayne Linkhorst ("Officer Linkhorst"), was, at all times relevant, a police officer acting under color of state law as an agent or employee of the Wilmington Police Department.

4. Defendant, Officer Avery Stewart ("Officer Stewart"), was, at all times relevant, a police officer acting under color of state law as an agent or employee of the Wilmington Police Department.

5. Defendant, Officer Michael Chambers ("Officer Chambers"), was, at all times relevant, a police officer acting under color of state law as an agent or employee of the Wilmington Police Department.

6. Defendant, Sergeant Dennis M. Leahy ("Sergeant Leahy"), was, at all times relevant, a police officer acting under color of state law as an agent or employee of the Wilmington Police Department.

7. Defendant, Sergeant Frederick G. Chaitt ("Sergeant Chaitt"), was, at all times relevant, a police officer acting under color of state law as an agent or employee of the Wilmington Police Department.

8. David Karas, Ph.D., was, at all times relevant, employed by the Wilmington Police Department as a police policy and communications director.

9. Defendant, former Chief of Police, Robert Tracy ("Chief Tracy"), was, at all times relevant, the Chief of Police for the Wilmington Police Department and acting under color of state law an agent or employee of the Wilmington Police

Department.  Chief Tracy was the Chief of Police for the Wilmington Police Department in or around 2021.

10.    Defendant, Wilmington Police Department ("WPD") is a Department within Defendant City of Wilmington, which is a municipal corporation duly organized, existing, and operating under and pursuant to the applicable laws of the State of Delaware.  WPD's office is located at the William T. McLaughlin Public Safety Building, 200 North Walnut Street, Wilmington, Delaware 19801.  At all relevant times, WPD was the employer of Officer Linkhorst, Officer Stewart, Officer Chambers, Sergeant Leahy, Sergeant Chaitt, David Karas, Ph.D., and Chief Campos. The WPD is responsible for providing law enforcement services to Wilmington, Delaware's largest city, and for hiring, training, supervising, disciplining, and retaining police officers employed by WPD, including Officer Linkhorst, Officer Stewart, Officer Chambers, Sergeant Leahy, Sergeant Chaitt, Chief Campos and other ("John Doe") officers who may be identified in the future.

11.    Defendant, the City of Wilmington is a municipality in the State of Delaware located in New Castle County.

12.    Defendant(s), John Doe police officers are as-yet unidentified Wilmington Police Officers acting under the color of state law, as agents or employees of the Wilmington Police Department, and who were involved in events underlying the subject lawsuit.

## Jurisdiction & Venue

13.    This is a civil action for damages arising under the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988.

14.    This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction pursuant to 28 U.S.C. §1367.

15.    Personal jurisdiction is proper insofar as all parties either reside in the District of Delaware, conduct business in the District of Delaware, or because the unlawful actions giving rise to the claim took place within the District of Delaware.

16.    Venue is properly in this Court pursuant 28 U.S.C. §1391(b) because the events giving rise to the suit occurred in this judicial District.

## Facts

17.    During the afternoon of Sunday, April 18, 2021, the Plaintiffs attended a birthday party for their two-year-old granddaughter, R.S.,[1] at the Urban Air Adventure and Trampoline Park, located in Newark, Delaware.

18.    At the time of the birthday party, the relationship between Ms. Smith and Geremiah Shepherd ("Mr. Shepherd"), who is the father of R.S., had ended.

---

[1] R.S. is the daughter of the Plaintiffs' daughter, Emani Smith ("Ms. Smith").

4

19.     The Plaintiffs, Ms. Smith and R.S. had already been at the trampoline park when Ms. Smith's new boyfriend – Brian Valmond ("Mr. Valmond") – arrived at the trampoline park to drop off a birthday present for R.S.

20.     Upon Mr. Valmond's arrival at the trampoline park fights broke out almost immediately between Mr. Shepherd his family and friends on the one hand, and Mr. Valmond and his friends on the other hand.  The Plaintiffs were not involved in any of the fights.

21.     The police were called, and Corporal Harrison, a police officer from the Delaware State Police (Troop 1) ("Corporal Harrison") arrived at approximately 4:15 p.m. to investigate and quell the situation.  The Plaintiffs provided statements to the police.  The other participants in the fights refused to do so.  Corporal Harrison generated a case number for the incident (*see* case number 022130943).

22.     While the interviews of the Plaintiffs were in progress, Mr. Shepherd and Mr. Shepherd's mother – Regan Mcelderry ("Ms. Mcelderry") – threatened the Plaintiffs, stating "this is not over," or words to that effect.  They also threatened to travel to the Plaintiffs' residence to continue and/or finish the fight(s).  Corporal Harrison was standing in close proximity to Mr. Shepherd and Ms. Mcelderry when the threats were made.  The Plaintiffs told Corporal Harrison  that Mr. Shepherd and Ms. Mcelderry had made similar threats in the past concerning the arrangements for Ms. Smith's custody of and visitation with R.S.  There were also other situations

5

where Mr. Shepherd and Ms. Mcelderly (as well as other individuals) had gone to the Plaintiffs' residence to confront the Plaintiffs and had engaged in violent and threatening behavior toward the Plaintiffs, once again, as a result of issues concerning custody of and visitation with R.S.

23.     Following the incident at the trampoline park, the Plaintiffs left the trampoline park and returned to their residence, located at 311 Eighth Avenue, in Wilmington.  Other family and friends came to the Plaintiffs' residence after the trampoline park to cut R.S.'s birthday cake and watch her open gifts.

24.     Approximately 20-30 minutes after the Plaintiffs and some of their family members arrived at the Plaintiffs' residence, Mr. Shepherd, Ms. Mcelderly, and approximately 30-40 of their family members and friends arrived at the Plaintiffs' residence and, believing Mr. Valmond was also present at the Plaintiffs' residence, started a riot in the Plaintiffs' front yard.  The frenzied mob engaged in loud, threatening  and aggressive behavior in a direct effort to attack the Plaintiffs and their family.  Several individuals attempted to force their way into the Plaintiffs' residence.  As a result, the screen door and main door and door frame were substantially damaged during the attack.

25.     Terrified by the rioting mob in their front yard, the Plaintiffs called 911 and were informed that officers from the WPD were en route.  The WPD did not, however, immediately arrive but, instead, took a while to respond to the request for

6

an emergency response.  In the meantime, the Plaintiffs were concerned that the mob was going to enter their residence and cause further destruction and potentially injure them and their family members and friends.

26.    Fearing for her own safety and that of her grandchildren due to the several fights that were occurring just outside the Plaintiffs' residence, Plaintiff Mrs. Butcher removed her grandchildren from the first floor of the Plaintiffs' residence to the third floor.

27.    Not long thereafter, several of the Plaintiffs' other family friends arrived on the scene while multiple fights were still raging on the yard outside of the Plaintiffs' residence.  Seeing that they were not safe, the family members and friends attempted to seek shelter inside the Plaintiffs' residence.  During this time, one of the attackers struck one of the Plaintiffs' family friends with a deadly weapon. Additionally, one or more of the attackers broke down the front door to the Plaintiffs' residence, causing substantial damage to it.  Furthermore, the Plaintiffs' car was damaged by the mob, including putting dents in multiple places.  Most troubling was that two individuals associated with the attacking group displayed firearms, further contributing to the chaos and exacerbating an already volatile situation.

28.    Observing that the situation was out of control and that the WPD still had not arrived, Mrs. Butcher went to the front door of her residence in an effort to help prevent any would-be attackers from entering the Plaintiffs' residence.  In a

further effort to deter any of the would-be attackers from continuing to try to enter the Plaintiffs' residence, Mrs. Butcher brought with her an unloaded firearm[2] that she intended to display as a momentary show of force.  Mrs. Butcher never left the threshold of the front door  of the Plaintiffs' residence while she was in possession of her legally owned firearm.

29.    The gun was visible for only a matter of seconds when Mrs. Butcher used one hand to try to pull Mr. Butcher (who was standing just outside the damaged front door) back into the Plaintiffs' residence while at the same time keeping the gun in her other hand and next to her waist.  Although Mrs. Butcher was legally justified in having her firearm to protect her family, at no point did she point the gun at anyone.

30.    One or more of the responding police officers – including Defendants Linkhorst, Stewart and Chambers – allegedly saw Mrs. Butcher in possession of the gun and instructed Mrs. Butcher to drop it, which she immediately did.

31.    Meanwhile, the horde of attackers was still present outside the Plaintiffs' residence, and continued to engage in threatening and tumultuous behavior.  The police either did not ask them to leave or, if they did ask the attackers to leave, they did not listen.  Numerous witnesses who were present at or near the

---

[2]Mrs. Butcher legally purchased the firearm and is the registered owner of the gun and has no criminal prior record.

8

scene expressed shock that no action was taken against the rioting mob. In fact, several neighbors at the scene questioned the police about why they did not command the attackers to leave the area. For reasons that remain unclear, none of the attacking horde was arrested for any of the several crimes being committed in the presence of the police.

32. Despite the fact that the angry mob of attackers arrived at the Plaintiffs' residence in order to do harm to the Plaintiffs and their friends and family members, the only individuals arrested were the Plaintiffs, the Plaintiffs' son (Quashie Smith Ross) and Mr. Valmond notwithstanding that each of them were lawfully on the Plaintiffs' residence and were justifiably attempting to protect themselves, their friends and their family members from being attacked.

33. For reasons that remain unclear, the police did not take the time to question the Plaintiffs about the events of the day. Instead, the police handcuffed the Plaintiffs and transported them to the WPD, where the Plaintiffs fully expected to be interviewed so that they could explain their version of what had occurred.

34. For reasons that also remain unclear, the Plaintiffs were never questioned at the police station either. Accordingly, the Plaintiffs were never provided an opportunity to explain what had happened at their property earlier in the day.

35.     During the police effort to arrest Mrs. Butcher, excessive force was exerted upon her.  In particular, Mrs. Butcher was manhandled by the arresting officers. She was flung around by her handcuffed arms. The handcuffs were too tight, and the officer refused to loosen them despite Mrs. Butcher's pleas.  Mrs. Butcher sustained  wrist pain  as a result of being handcuffed too tight and being pulled around in a rough manner by her handcuffed arms.  Mrs. Butcher was subsequently placed in the back of a hot patrol car for an extended period; her multiple requests for a window to be opened were denied.

36.     After being confined to separate holding cells for approximately seven (7) hours, the Plaintiffs were ultimately formally charged with an assortment of felony and misdemeanor offenses.  Mrs. Butcher was charged with: 4 counts of Aggravated Menacing,  Possession of a Firearm During the Commission of a Felony, and Terroristic Threatening.  On the other hand, Mr. Butcher was charged with: Disorderly conduct, Hindering Prosecution and Offensive Touching of a Law Enforcement Officer.

37.     The  Plaintiffs were very upset that they were never interviewed and, on their own volition, on April 24, 2021, the Plaintiffs went to the WPD and arranged to speak to Officer Haines.  The Plaintiffs then – for the first time – were permitted to explain what occurred.  Officer Haines recorded the Plaintiffs' statements and included them in his two-page supplemental report (*see* case number 302129888).

After Officer Haines heard the Plaintiffs' version of events, he indicated that they should never have been arrested. Officer Haines then provided his two-page report to his supervisor – Sergeant Chaitt– for Sergeant Chaitt's review and approval.

38.    Perhaps due to the sheer number of individuals involved in the incident, the tragic events of April 18, 2021 attracted media attention. The WPD issued a press release which contained false and wholly inaccurate information. Within the press release, WPD spokesman Karas provided a quote that falsely stated that Mrs. Butcher pointed a firearm at the WPD police officers.

39.    Articles concerning the April 28, 2021 incident were published on delawarenewsline.com and on the WDEL news web page. To their shock, horror and disbelief, the Plaintiffs saw that their mug shots had been provided by the WPD and published in the delawarenewsline.com article.

40.    Despite the fact that Officer Haines recorded the Plaintiffs' interviews in his report, and notwithstanding the fact that Sergeant Chaitt reviewed and approved Officer Haines' report (which included the Plaintiffs' version of events), the charges against the Plaintiffs still proceeded.

41.    Subsequently, on June 15, 2021, during Mrs. Butcher's preliminary hearing in the Court of Common Pleas, the Honorable Bradley V. Manning ("Judge Manning"), after considering the evidence that the WPD presented against Mrs. Butcher, concluded that there was no probable cause to arrest Mrs. Butcher for the

11

felony offenses and, accordingly, dismissed the felony charges against Mrs. Butcher. With the felony-level offenses having been dismissed, Mrs. Butcher only faced one misdemeanor-level offense – Terroristic Threatening – which purportedly involved a claim by one of the rioters who had unlawfully appeared at the Plaintiffs' residence that Mrs. Butcher threatened her in some manner.[3]

42.     Thereafter, on August 29, 2022, the prosecution – without explaining their rationale for doing so – voluntarily dismissed the remaining Terroristic Threatening charge that had been pending against Mrs. Butcher, thereby completing the dismissal/dropping of all charges against Mrs. Butcher.

43.     With respect to the charges that were still pending against Plaintiff Mateo Butcher, the Disorderly Conduct charge was dropped by the prosecution on the morning of August 31, 2022, thereby leaving Mr. Butcher with only Hindering Prosecution and Offensive Touching charges to defend.

44.     Thereafter, a jury trial was convened in the Court of Common Pleas with respect to the lone charges of Hindering Prosecution and Offensive Touching. Mr. Butcher was found not guilty of both charges by the jury on the afternoon of August 31, 2022.

---

[3]To add insult to injury, the alleged victim of the Terroristic Threatening charge was one of the ring leaders of the mob who orchestrated the riot at the Plaintiffs' property. As indicated, *supra*, contrary to what happened to the Plaintiffs, none of the individuals associated with the mob were arrested for anything that occurred that day, including, but not limited to, rioting on the Plaintiff's front yard, kicking in their front door, denting their car, or attacking members of their family and friends.

12

45.    The relevant facts cited above were reviewed by multiple officers employed by the WPD, by one or more attorneys employed by the Office of the Attorney General, and fully litigated in two courts.  Once the full facts were revealed, all charges that had at one time or another been pending against the Plaintiffs were dismissed or resulted in acquittals.

46.    However, despite the fact that the Plaintiffs were fully exonerated, the fact remains that they were unlawfully arrested, detained, imprisoned, maliciously prosecuted and subjected to public embarrassment and humiliation, all as a result of the Defendants' actions, inactions, tortious conduct, constitutional violations, and other civil wrongs, as is discussed in further detail hereunder.

### COUNT I – EXCESSIVE USE OF FORCE (Constitutional)
### (Against Defendants Linkhorst and Chambers)

47.    Plaintiffs incorporate the preceding allegations as though they are expressly stated in this Count.

48.    At all times relevant, Officer Linkhorst and Officer Chambers were acting under color of state law.

49.    Officers Linkhorst and Chambers knowingly, intentionally and/or recklessly exerted excessive force against Mrs. Butcher on the evening of April 18, 2021.

50.    Officers Linkhorst and Chambers also knowingly, intentionally and/or recklessly violated Mrs. Butcher's rights under the Fourth Amendment to the United

States Constitution and Article I, § 6 of the Delaware Constitution as secured by 42 U.S.C. §1983.

51.   Mrs. Butcher had a right to be free from excessive force.

52.   As a result of these Constitutional violations, Mrs. Butcher suffered physical injury and mental distress, as well as the additional damages identified hereunder

**COUNT II – FALSE ARREST**
**(Against All Defendants)**

53.   Plaintiffs incorporate the preceding allegations as though they are expressly stated in this Count.

54.   The WPD lacked probable cause to justify the arrest of either of the Plaintiffs for any of the crimes charged.[4]

55.   Notwithstanding the fact that the WPD lacked probable cause to justify the arrest of either of the Plaintiffs for any of the crimes charged, upon information and belief, the WPD officers involved swore out and presented to a magistrate at the Justice of the Peace Court an affidavit of probable cause which falsely indicated that the Plaintiffs had committed multiple crimes in their presence, and without the benefit of the Plaintiffs' version of events.

---

[4]No reasonable person who came upon the chaotic scene on the night of April 18, 2021 would have thought that the Plaintiffs had committed a crime, let alone multiple crimes.

56.     The criminal charges brought against the Plaintiffs in the arrest warrant were tainted by false, one-sided statements lacking in context.

57.     The criminal charges were ultimately dropped and/or not prosecuted and/or resulted in acquittals, but only after the Plaintiffs endured the indignity of an unlawful public arrest.

58.     As a direct and proximate result of the Defendants' actions and the Plaintiffs' false arrest, the Plaintiffs suffered the damages identified hereunder.

## COUNT III – FALSE IMPRISONMENT
### (Against All Defendants)

59.     Plaintiffs incorporate the preceding allegations as though they are expressly stated in this Count.

60.     The Defendants detained the Plaintiffs in separate holding cells for approximately seven (7) hours while formal charging decisions were being made.

61.     For approximately seven (7) hours, the Defendants deprived the Plaintiffs of their liberty.[5]

62.     The deprivation of the Plaintiffs' liberty was without their consent.

63.     The deprivation of the Plaintiffs' liberty was without legal justification.

---

[5]What the Plaintiffs endured on the evening of April 18, 2021 is something no civilized person should be required to endure.  They were confronted by a riotous mob, fights were rampant on their front yard, their front door was kicked in, their car was dented, their family members and friends were accosted and yet Mr. Butcher was arrested for purportedly being disorderly on his own property and Mrs. Butcher was arrested for possessing a lawfully registered and owned firearm, also while she confined herself to the sanctity of her own property.

64.    As a direct and proximate result of the Defendants' actions, the Plaintiffs suffered the damages identified hereunder.

## COUNT IV – MALICIOUS PROSECUTION (CONSTITUTIONAL)
### (Against All Defendants)

65.    Plaintiffs incorporate the preceding allegations as though they are expressly stated in this Count.

66.    Defendants lacked probable cause to charge the Plaintiffs with any crime.

67.    Defendants, without factual or legal justification, swore out and presented an affidavit of probable cause which was false and misleading and contained a myopic view of the true facts, and thereafter maliciously caused the Plaintiffs to be charged with multiple felony and misdemeanor-level crimes.

68.    Defendants subjected the Plaintiffs to an unlawful arrest, unreasonable detention and false imprisonment, and caused them to be charged with multiple crimes in an attempt to cover up their own abuses of power, including, but not limited to, their failure to respond to the Plaintiffs' residence in an emergent manner, their failure to arrest and prosecute individuals who threatened and terrorized the Plaintiffs and who caused damage to the Plaintiffs' personal property.

69.    The fact that all of the charges were brought without factual or legal justification and were otherwise without merit is borne out by the fact that all charges that were initially presented against Mrs. Butcher were ultimately dismissed or

16

otherwise not prosecuted. Additionally, all charges that were presented against Mr. Butcher were dropped or resulted in acquittals.

70. Each of the Defendants knew that the charges being presented against the Plaintiffs were false and did not take into account the Plaintiffs' version of events (because no officer even attempted to interview the Plaintiffs) nor the prior history involving the Plaintiffs' assailants.

71. Each of the Defendants knowingly, intentionally, and/or recklessly violated the Plaintiffs' rights under the Fourth Amendment to the United States Constitution and Article I, § 6 of the Delaware Constitution as secured by 42 U.S.C. §1983.

72. The Plaintiffs had a right to be free from malicious prosecution.

73. As a result of these Constitutional violations, Plaintiffs suffered the damages identified hereunder.

## COUNT V – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

74. Plaintiffs incorporate the preceding allegations as though they are expressly stated in this Count.

75. On the evening of April 18, 2021, the Defendants acted negligently in the manner in which they handled the situation in general, and in which they treated the Plaintiffs, in particular.

76.    At the time of the Defendants' negligent acts, the Plaintiffs were in the immediate area of physical danger.

77.    The negligent acts of the Defendants, in turn, produced physical, mental and emotional consequences to the Plaintiffs, including, but not limited to, injuries to their wrists and other body parts as well as emotional scars which required counseling and therapy.

78.    As a direct and proximate result of the Defendants' negligent infliction of emotional distress, the Plaintiffs suffered damages, including, general and special compensatory damages (including damages for harm to reputation, good name and favor, alienation of association), mental and physical suffering, in addition to the damages identified hereunder.

## COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against All Defendants)

79.    Plaintiffs incorporate the preceding allegations as though they are expressly stated in this Count.

80.    The Defendants made false statements in the affidavit of probable cause in furtherance of obtaining an arrest warrant from the issuing magistrate at the Justice of the Peace Court.

81.    The Defendants' acts of making false statements in the affidavit of probable cause in furtherance of obtaining an arrest warrant and the infliction of the emotional distress which resulted to the Plaintiffs therefrom were done intentionally,

willfully, wantonly or with reckless disregard for the interests of the truth and the well-being of the Plaintiffs.

82.  The Defendants' acts of making false statements in the affidavit of probable cause in furtherance of obtaining an arrest warrant was outrageous in character and extreme in degree.

83.  The Defendants' acts of detaining, arresting, falsely imprisoning and thereafter prosecuting Plaintiff Deshawn Butcher was also outrageous in character and extreme in degree.

84.  The Defendants' acts of detaining, arresting, falsely imprisoning and thereafter prosecuting Plaintiff Mateo Butcher (including exposing him to a costly public jury trial) was also outrageous in character and extreme in degree.

85.  The Defendants' acts of making false statements in open court (both during the preliminary hearing in Plaintiff Deshawn Butcher's case and during a jury trial in Plaintiff Mateo Butcher's case) was also outrageous in character and extreme in degree.

86.  The Defendants' decision to press forward with the charges despite receiving the Plaintiffs' rendition of what occurred on the evening of April 18, 2021, in addition to the past history involving the assailants, exposed the Plaintiffs to public embarrassment, annoyance, inconvenience and alarm, in addition to defamatory remarks being directed at/to them.  The decision to proceed with the

charges all the way through trial despite the fact that the charges lacked merit was also outrageous in character and extreme in degree.

87.    The Defendants' aforementioned acts go beyond all possible bounds of decency and are utterly intolerable in a civilized community.

88.    It was reasonably foreseeable that the Defendants' negligent conduct would have caused the Plaintiffs to suffer emotional harm.

89.    The Defendants' aforementioned acts, in fact, caused Plaintiffs to suffer severe mental and emotional distress that no reasonable person should have to suffer, including, but not limited to, the damages identified hereunder.

## COUNT VII – DEFAMATION
### (Against All Defendants)

90.    Plaintiffs incorporate the preceding allegations as though they are expressly stated in this Count.

91.    Following the arrests of the Plaintiffs on April 18, 2021, the WPD issued a press release which contained false statements about the Plaintiffs and the circumstances underlying their arrests.  Those false statements included, but were not limited to, the erroneous statement that Mrs. Butcher pointed a gun at one or more police officers.

92.    Those false statements about the Plaintiffs were widely published in the State of Delaware and made public for all to see (including Plaintiffs' bosses, family

20

members and friends[6]) via print media – including, but not limited to the WDEL website as well as an article that was published on Delawarenewsline.com, which included "mug shots" of the Plaintiffs – in addition to false statements that were broadcast on the radio.  No corrections or retractions were ever released.

93.    The articles that were issued as a result of the WPD's press release portrayed the Plaintiffs in a very bad light, damaged their reputations, and has caused them substantial mental distress.

94.    On the other hand, there were no press releases, follow-up articles or publications, nor coverage on the radio, when Judge Manning dismissed the felony charges against Mrs. Butcher at her preliminary hearing in the Court of Common Pleas or when the remaining charges that had been pending against Mrs. Butcher were dropped.[7]

95.    Similarly, there were no press releases, follow-up articles or publications, nor coverage on the radio, when a New Castle County jury found Mr. Butcher not guilty of all charges that had been pending against him.

96.    The materially false information the Defendants published or otherwise communicated in the affidavit of probable cause was broadcast to the general public.

---

[6] The Plaintiffs have been married for over 20 years. Both have full time jobs, children, and are very highly regarded in the community.  Additionally, Mrs. Butcher works for the State of Delaware as a Senior Social Worker while Mr. Butcher works full time for Christiana Care.

[7] The charges that were lodged against the Plaintiffs were precipitated by the false claims made by those associated with the mob, including, but not limited to, the instigators of the initial round of fights at the trampoline park.

97.    The false rendition of the facts which were published or otherwise communicated and which was subsequently broadcast to the general public concerned the Plaintiffs.

98.    The statements that were published, broadcast and/or communicated to the general public caused material or reputational harm to the Plaintiffs.

99.    In publishing and/or communicating materially false information about the Plaintiffs which was subsequently broadcast to the general public, the Defendants acted either negligently or with actual malice.

100.    As a direct and proximate result of the Defendants' defamatory statements, the Plaintiffs have suffered damages, including, general and special compensatory damages (including damages for harm to reputation, good name and favor, alienation of association), mental and physical suffering, in addition to the damages identified hereunder.

## COUNT VIII – DEFAMATION *PER SE*
### (Against All Defendants)

101.    Plaintiffs incorporate the preceding allegations as though they are expressly stated in this Count.

102.    As indicated, *supra*, following the arrests of the Plaintiffs on April 18, 2021, the WPD issued a press release which contained false statements about the Plaintiffs and the circumstances underlying their arrests, including statements that

should be considered inherently damaging to the Plaintiffs' reputation and standing within the community at large.[8]

103. In Delaware, statements that are considered defamatory *per se* include, but are not limited to, disparaging statements which are intended to injure a person in his or her trade or business as well as statements which indicate or suggest the commission of a crime of moral turpitude.

104. The Defendants knowingly caused or allowed a false report to be filed with the Court and, in turn, the false information contained therein was released to the media and widely released, published, broadcast, communicated and/or otherwise disseminated.

105. No privilege exists.

106. As a direct and proximate result of the Defendants' defamatory *per se* statements, the Plaintiffs suffered damages, including, general and special compensatory damages (including damages for harm to reputation, good name and favor, alienation of association), mental and physical suffering, in addition to the damages identified hereunder.

---

[8] *See* footnote 6, *supra.*

## COUNT IX – NEGLIGENT TRAINING
### (Against All Defendants)

107. Plaintiffs incorporate the preceding allegations as though they are expressly stated in this Count.

108. The WPD is one of the largest employers within the City of Wilmington. According to the WPD's website, at all times relevant, the WPD included 312 full-time, sworn police officers in addition to civilian support staff.

109. The duty of hiring, training, supervising and retaining police officers who are employed by the WPD ultimately falls to the Chief of Police, Robert Tracy and all officers who fall under the Chief's chain of command. In this latter regard, the Chief of Police is vicariously liable for the actions, torts, wrongs and constitutional violations committed by any and all police officers within the WPD's work force pursuant to the doctrine of *respondeat superior*.

110. In addition to the civil liability faced by the Chief of Police, also within the chain of command of the WPD are various supervisors whose function is to, *inter alia*, oversee the actions of those officers who report to them, including, but not limited to, properly chain those junior officers who fall under their command.

111. The WPD has the duty to property train all police officers within its employ. In this regard, any officer, no matter what their position or rank within the WPD, including supervisors, who fail(s) to properly train an employee (police

24

officer) who comes under their command and who causes harm to others, is liable for negligent supervision.

112.   The WPD's failure to property train a police officer constitutes negligent training and subjects the WPD itself (as the government's policymaker for all police training issues) to civil liability, as well as the individual or individuals responsible for training programs, including, but not limited to, Chief of Police Wilfredo Campos and any all officers acting in a supervisory training capacity.[9]

113.   To establish a claim for negligent training, the Plaintiffs have the burden of establishing:

     (a)    the violation of a federally protected right pursuant to 42 U.S.C. § 1983;

     (b)    inadequate training of employees by the employer, and
     (c)    the inadequate training proximately caused the Plaintiffs' injury.

114.   The police officers involved in investigating the facts and circumstances of the incident on April 18, 2021, and who subsequently arrested, detained, imprisoned and prosecuted the Plaintiffs – including, but not limited to, Officers Linkhorst, Stewart and Chambers – were negligently trained on, for instance but not by way of limitation, how to properly handle the types of situations

---

[9]In particular, supervisory liability can attach when the failure to train amounts to deliberate indifference to the rights of persons with whom subordinates come into contact, and the failure to train proximately causes injury to the Plaintiff, even if the supervisor was not directly involved in the deprivation.

25

they encountered on April 18, 2021, how to effect an arrest of a subject without injuring them, how to interview witnesses and potential suspects, and how to clearly and accurately record real time events in police reports.

115. In particular, Officers Linkhorst, Stewart and Chambers failed to properly investigate the events of April 18, 2021 and, importantly, they caused injury to Mrs. Butcher. Additionally, they failed to interview the Plaintiffs concerning the history underlying the arrival of the mob and their actions in attempting to defend themselves. Without first speaking to the Plaintiffs concerning the events that occurred at the trampoline park (as Officer Harrison of the Delaware State Police had appropriately and professionally done), the WPD only had one version of events at their disposal at the time they completed and presented the affidavit of probable cause to the magistrate. The factual version that the police accepted as true, recorded in their respective reports, and subsequently relayed to the magistrate at the Justice of the Peace Court, led to the unlawful arrest of the Plaintiffs.

116. As a direct and proximate result of the Defendants' actions, the Plaintiffs suffered the damages identified hereunder.

## COUNT X – NEGLIGENT SUPERVISION
### (Against All Defendants)

117. Plaintiffs incorporate the preceding allegations as though they are expressly stated in this Count.

118. As indicated, *supra*, the duty of hiring, training, supervising and retaining police officers who are employed by the WPD ultimately falls to the Chief of Police, Wilfredo Campos and all officers who fall under the Chief's chain of command. In this latter regard, the Chief of Police is vicariously liable for the actions, torts, wrongs and constitutional violations committed by any and all police officers within the WPD's work force pursuant to the doctrine of *respondeat superior*.

119. In addition to the civil liability faced by the Chief of Police, also within the chain of command of the WPD are various supervisors whose function is to, *inter alia*, oversee the actions of those officers who report to them, including, but not limited to, reviewing and approving police reports that are submitted to the supervisors for review and approval. As supervisors, they have the obligation to ask the submitting officer questions about the incidents being reported prior to signing off on the reports, to request that additional information be provided in the reports prior to signing off on same if the supervisor believes that the information stated in the reports may not be accurate based upon what other officers have separately reported about an incident or event, and to decline to sign off on a report that is inaccurate, misleading or incomplete.

120. Any officer, no matter what their position or rank within the WPD, including supervisors, who fail(s) to properly supervise an employee (police officer)

27

who comes under their command and who thereby fails to avoid foreseeable risks of harm to others, is liable for negligent supervision.

121.   Under Delaware law, in order to state a claim for negligent supervision, the Plaintiff has the burden of establishing that:

(a)   the Defendant(s) had a duty to supervise the harming party;

(b)   the Defendant(s) negligently supervised the harming party; and

(c)   such negligence proximately caused the Plaintiffs' injuries.

122.   On April 18, 2021, Sergeant Leahy was the supervising officer assigned to, *inter alia*, review the individual reports prepared and submitted by Officers Linkhorst, Stewart, and Chambers (and perhaps other officers, as will be determined through discovery).

123.   As is evident from the reports themselves, Officers Linkhorst, Stewart and Chambers did not take the time to interview the Plaintiffs concerning the chronology of events and history underlying the tension between the Plaintiffs and their attackers.  Had they done so, Officers Linkhorst, Stewart and Chambers – as well as their supervisor, Sergeant Leahy – would have been educated as to the prior history between the parties, as well as the events which had precipitated a large mob of angry individuals appearing outside the Plaintiffs' residence.  In turn, the police would have understood that the Plaintiffs were lawfully defending themselves and their family members from within their own residence.

124. Instead, the WPD officers who responded to the scene – including Officers Linkhorst, Stewart and/or Chambers, were permitted to author and submit an affidavit of probable cause which lacked context, which was fraught with errors, misinformation, and half-truths, and which did not include the Plaintiffs' explanation of the situation that led to their unlawful arrest. Perhaps most importantly the affidavit of probable cause indicated that probable cause to arrest the Plaintiffs existed when, in fact, it did not.

125. In addition to the liability that attaches to Officers Linkhorst, Stewart and Chambers for their actions and inactions, Sergeant Leahy also bears civil liability insofar as he reviewed the reports but did nothing but rubber stamp them in furtherance of the Plaintiffs' continuing arrest, unlawful imprisonment and prosecution.

126. As of April 18, 2021, upon information and belief, Sergeant Leahy was the supervising officer assigned to review and review the police reports that were prepared by Officers Linkhorst, Stewart and Chambers and submitted to Sergeant Leahy for approval so that an accurate affidavit of probable cause could then be submitted to a reviewing magistrate at the Justice of the Peace Court and so that the prosecution of the Plaintiffs could continue.

127.    In the event Sergeant Leahy believed that the information contained within any of the reports may have been inaccurate, misleading or incomplete, he was obligated to refuse to sign off on the report(s).

128.    Upon information and belief, Sergeant Leahy reviewed and approved the substance and accuracy of each reports that were submitted by Officers Linkhorst, Stewart and Chambers.

129.    Upon information and belief, Sergeant Leahy did not seek or insist upon any revisions, additions or other amendments to any of the reports.

130.    Upon information and belief, Sergeant Leahy did not question any of the officers who authored police reports as to why the Plaintiffs were not interviewed regarding their version of events either before or after being arrested and hauled off to the WPD for processing.

131.    Upon information and belief, the information that was included in the various police reports was summarized and thereafter included in the affidavit of probable cause that was then provided to the magistrate at the Justice of the Peace Court for review and approval.

132.    Upon information and belief, Sergeant Leahy did not insist that the Plaintiffs' version of events be recorded and included in the affidavit of probable cause before it was submitted to the reviewing magistrate at the Justice of the Peace Court for approval.

133. The Plaintiffs were not interviewed by Officer Haines until April 24, 2021, six (6) days after the Plaintiffs were arrested. By that time, the affidavit of probable cause had already been submitted and approved, meaning the prosecution of the Plaintiffs was well underway by then.

134. Additionally, upon information and belief, Officer Chaitt – who reviewed and approved the report provided by Officer Haines – approved Officer Haines' report.

135. Upon information and belief, upon learning the Plaintiffs' version of the events on April 18, 2021, Officer Chaitt did not speak to Sergeant Leahy about the Plaintiffs' version of events nor discuss how the Plaintiffs' version may impact the legality of proceeding with the charges against the Plaintiffs. Instead, the prosecution of the Plaintiffs continued notwithstanding the inclusion (albeit rather late) of their version of events into the case file.

136. As a direct and proximate result of the Defendants' actions, the Plaintiffs suffered the damages identified hereunder.

**WHEREFORE**, Plaintiffs, Deshawn Butcher and Mateo Butcher, respectfully request that this Court:

A.    Grant judgment in their favor and jointly and severally against all Defendants;

B.    Award them special damages as they can prove;

31

C.     Award them compensatory damages as they can prove;

D.     Award them punitive damages;

E.     Award them costs and attorneys' fees for prosecuting this action;

F.     Award them pre- and post-judgment interest; and

G.     Grant such other relief as the Court deems proper.


**RHODUNDA, WILLIAMS AND KONDRASCHOW**


By:     */s/ William J. Rhodunda, Jr., Esquire (# 2774)*
        William J. Rhodunda, Jr., Esquire (# 2774)
        Brandywine Plaza West
        1521 Concord Pike, Suite 205
        Wilmington, Delaware 19803
        (302) 576-2000 – Telephone
        (302) 576-2004 – Facsimile
        *Bill@rawlaw.com*

        *Attorneys for Plaintiffs,*
        *Deshawn Butcher and*
        *Mateo Butcher*


Date E-Filed:   April 17, 2023